UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA                    CASE NUMBER: 8:15-CR-451-T-23JSS

-v-

ROBERT JOSEPH QUINN,

     Defendant

_____/

**SENTENCING MEMORANDUM SUBMITTED ON
BEHALF OF DEFENDANT ROBERT JOSEPH QUINN**

COMES NOW the Defendant, ROBERT JOSEPH QUINN, by and through the undersigned

attorney and respectfully submits this factual and legal summary in sentencing proceedings. In this

submission counsel presents critical facts and argument in support of a request for a sentence

reflecting leniency.

## I. INTRODUCTION

This submission is respectfully presented in support of an appropriate sentence. The

discussion has been vectored away from the general to the case specific. The factual rendition in the

revised Presentence Investigation Report (PSR) filed on May 4, 2016, provides significant details

about Bob Quinn's background and his association with law enforcement throughout his illustrious

Drug Enforcement Administration (DEA) career. It likewise includes personal information that

reflects upon the character of the person being sentenced. More information on multiple subjects

comes from letters included in the record that mirror the perception of the man before the Court in

the minds of all that know him.

When this event became public many volunteered their assistance for the mitigation process.

Some suggested what could be said and should be said at sentencing. Fortuitously letters came

which now form the basis, through excerpts, of the relief requested in this submission.

The defense has objected appropriately to the inclusions related to the enhancement for abuse of position of trust in the PSR. The government likewise objected. At and since the position of the parties meeting there were genuine concerns voiced about the application of the law to the facts of this case. Discussion of that topic necessarily is included here. What hopefully will become evident to the Court once the guideline issue is resolved is how completely and dramatically out of character this singular event has been in a law enforcement career spanning nearly three decades.

The material supports mitigation in general, through departure or variance, predicated on fact as opposed to speculation. The quality of the authors and their own reputations is something worthy of note. This is simply not a band of brothers and sisters speaking, these are the best of the best that all agree this was an isolated incident in an otherwise universe of exemplary conduct. Added to that are the morsels provided by lay witnesses that show yet another remarkable side of Bob Quinn.

## II. PROCEDURAL STATUS

On October 29, 2015, the Government filed a one count information formally charging the Defendant, ROBERT JOSEPH QUINN, hereinafter referred to as the "Defendant" or "Quinn," with providing a false statement to a federal law enforcement officer in violation of 18 U.S.C. §1001(a)(2). The conduct charged took place "on or about April 17, 2014."

On October 22, 2015, the Defendant executed a plea agreement in this cause which was later filed on October 30, 2015. On November 20, 2015, the Defendant appeared before the Honorable Julie S. Sneed, United States Magistrate, and entered a guilty plea to the singular charge pursuant to the terms of the plea agreement of record.

The Presentence Investigation Report was prepared by David J. Salce, United States

Sentencing Guideline Specialist. After significant discussion and meetings between all parties involved, the revised version of the PSR was filed on May 4, 2016. The matter remains calendared for sentencing on May 11, 2016, before this Honorable Court.

### III. ROBERT QUINN

Robert "Bob" Quinn is a local product who from an early age wanted to serve in law enforcement. He began his tenure at the University of South Florida Police Department. Fortuitously for him, and frankly for the nation as a whole, he moved on to the Drug Enforcement Administration in what could still be termed part of his formative years. He worked with and learned from some of the most respected special agents in charge and teamed with some of DEA's most talented troops at the height of the war on drugs.

Amongst Quinn's early assignments was his role on the trial team during the prosecution of Colombian drug lord Carlos Lehder. For months he assisted the prosecution at the direction of Robert Merkle himself. The knowledge gained from such a complex event added to the repertoire of tools that would eventually elevate him to a practical league of his own. Quinn's cases have been of significant profile. While he has also handled many of the ordinary and more common ones he was known during his tenure as an individual who could direct the most critical investigations while at the same time share information with others at his office and at other agencies. In a time when that latter trait was not common Quinn was a groundbreaker. This is evident in the battery of notes that have come in support of Quinn from those very agents who did not work at DEA but were those that summoned his assistance and received it without reservation.

Quinn likewise was an individual who distributed the laurels of success while generally assigning himself the responsibility wholeheartedly for any team failures. He was never denied a

promotion, was never restricted on his cases and was never the subject of motivation that did not already come from within. Quinn traveled the continent extensively on behalf the United States in his most dangerous line of work. It's fair to note what many have said about Quinn. Excerpts from the letters that the Court has been provided shed light on some of the traits that he himself downplays that have been the subject of so much praise over the years.    The private side of Quinn is admirable. He was a true friend to his friends, a family man, a man of faith and a man all could depend on in times of need, a true man for others.

## IV. RELATIONSHIP WITH SAM MURAD

Bob Quinn and Sam Murad met while both were in college at the University of South Florida. They worked out together and established a collegiate relationship that would span until the present. Shortly after they befriended each other they began to talk about future career opportunities. Both had well defined aspirations to become members of law enforcement. While Quinn eventually ended at the University of South Florida (USF) Police Department, Murad went on to the Hillsborough County Sheriff's office to serve as a road deputy. They continued to spend time together and were lucky that Murad's district at the time bordered on the USF Police Department jurisdiction and thus they were able to work on many investigations together. Eventually both would end up at the Drug Enforcement Administration.

Quinn, on the one hand, was someone that was widely respected and extremely well liked. His work ethic was enviable, his success rate in investigations was equally impressive. Murad did not enjoy the same qualities and he became the lightning rod at times for significant criticism. He had troubles with just about every supervisor he worked with at DEA even transferring to Miami out of sheer necessity for survival. Quinn nevertheless enjoyed Murad's company and respected him as

both a friend and a person. Quinn, who seemingly had it all, was very protective of his friend Sam Murad, who seemingly lacked a lot. And because of Quinn many say Murad survived. When Murad retired from DEA the friendship continued and Quinn remained there for his friend in Murad's times of need.

## V. CAREER AND PERSONAL ASSESSMENTS

Out of the letters submitted for consideration certain information and excerpts have been drawn and included in this section. All letters could have been referenced but random selection yields what follows. Jim Sweeting, Sarasota Police/DEA, retired, indicated, that "if everybody in the law enforcement arena had the integrity and credibility that Quinn had, what a better world we would live in." TJ Ayo, unrelated to law enforcement and just a young fellow whose parents knew Quinn, wrote a note expressing his personal gratitude for the support and the advice Quinn gave him in his early and formative years when he was hanging out with the wrong crowd and doing the wrong things. Ayo indicated that had he not spoken to Bob Quinn when he did, he "would be in a different place in his life now." He reflected as he looked back upon how much concern Quinn exhibited.

Camille Colon, one of the first female agents hired at DEA in 1980, expressed her admiration for Quinn and acknowledged "we all make misjudgments." She suggested that nearly thirty years of law enforcement were "marred by one mistake" but respectfully requested the Court to look at "the big picture of the agent, the family man, the example and the true friend" over the most difficult of times. Alex Angulo, of the Organized Crime Unit of the Polk County Sheriff's Office, indicated that Quinn was "extremely admired by the entire office in the Tampa district," and for that matter, everywhere else.

Robert E. Davis, Supervisory Special Agent at DEA, retired, indicated that Bob Quinn had

many best friends, people who felt Bob was indeed their best friend. According to Davis that happened because Quinn would take "the time out to listen and show genuine concern for others." Davis who knew the players involved here indicated that this mistake, singular at that, was evidence of "misguided concern for another friend." John Potanovich, an attorney and friend, praised the loving son and doting, caring father that Quinn has always been, the tremendous friend and role model he's been to countless and the loyal man of faith he's been for his entire life. Daniel Dunn, a Supervisory Special Agent, retired, indicated that while he was in charge of Customs for the Department of the Treasury in Tampa, he developed a close relationship with Bob Quinn. He indicated Quinn, "possessed a high degree of intelligence and had a highly developed sense of deductive reasoning. Just as important as those characteristics he demonstrated that he was a dedicated, compassionate and caring individual." Dunn went on to recount how they once sent contract pilots in a twin-engine aircraft deep into the Colombian jungle to retrieve 500 kilograms of cocaine. The aircraft crashed and the pilots were missing for three weeks. It was Bob Quinn who resolved the welfare of the pilots. Dunn added that Quinn demonstrated professionalism and compassion always, with witnesses, confidential informants and even with defendants. He characterized Bob as doing the right thing for the right reasons. In addition he vouched for his religious and civic activities. He noted Bob was a devout believer throughout his career, and a family man with a deep sense of personal ethics and morals.

Michael Miller, Supervisory Special Agent, retired, of the United States Customs Service indicated that from 1985 through 1990 he was in charge of air smuggling investigations crossing over many geographical jurisdictions and working with numerous agencies. He noted that the success or failure of investigations was "in many instances rooted in the individual personalities of

investigators from those agencies and almost routinely involved inter agency turf battles and lack of cooperation." Yet Miller noted that as a result of Bob Quinn's intervention, and the fact that he was a team player and a man of his word, was honest and reliable, he quickly saw that whenever Bob Quinn came to Customs all the Customs employees stopped what they were doing to smile, greet him with genuine fondness and more importantly, do so with significant respect. Miller went on to note that he could not think of a single instance when anyone ever said a negative word about Bob Quinn, but most important of all, he could not recall Bob Quinn ever saying a negative word about anyone else. Miller went on to relate that he maintained close contact with Quinn over the years. He said, "I believe his loyalty to a former coworker might be responsible for his current charge. Bob made a terrible mistake and I personally heard Bob state from the inception that [he] had made a big mistake and had to pay for it." Miller noted that Quinn accepted responsibility in this matter and did not try to minimize or rationalize his conduct in any way.

Paul Pitts was a Special Agent with DEA. While working undercover in Jamaica he was piloting an aircraft while Quinn ended up alone with the traffickers below wearing a transmitter. The plane was late in arriving. As a result of the unexpected a firefight ensued and assault weapons surfaced. Quinn remained calm, collected and professional as he directed the very dangerous apprehension of the defendants. According to Pitts, this was just one example of Bob's courage, professionalism and leadership, one example of many that he directly observed. Pitts went on to note a personal tragedy. When his own wife died in an accident and his daughter was seriously injured it was Bob Quinn who met Pitts at the airport and provided the comfort necessary to survive that critical moment.  It was that same Quinn that had often told Pitts not to blaspheme and to try to make himself at all times a better person.

Daniel Balestriere, United States Customs Special Agent, retired, has known Quinn for twenty-five years. He noted that the "criminal conduct that Bob admitted in your court is clearly a total aberration of Bob's lifelong conduct." Whitley Azure indicated that throughout the thirty-one years in Customs he had never met a more sincere and dedicated individual from another agency. Working with Quinn made everyone around him a better person wanting to do everything the right way under the law. Azure noted that some law enforcement officers attempt to rationalize stepping over the line but that was never the attitude taken or promoted by Quinn. Azure also noted that he remembers his supervisor saying in briefing rooms whenever they were set to work with Quinn on a case to "keep in line with [Quinn] and follow his lead." Quinn's work ethic was above everyone else's. Cheryl Roggensack has indicated that she has known Quinn through her work as a United States Probation Officer. She found him to be always honest, reliable and respectful. She wrote that Quinn never made generalizations about offenders. Most important of all she knows that "his actions stand in stark contrast to what she observed throughout her career and represent a departure from his otherwise admirable character."

Robert Siwik, Chief of Police the University of South Florida Police Department, has known Quinn for nearly forty years. As his sergeant at USF he helped train him in basic procedures and investigations. He observed Quinn's exceptional growth and development. He characterized Quinn as a decent, honest and caring person. He wrote, "these are the characteristics which matter most and clearly define [Quinn's] character both as a professional and as a friend." Siwik went on to recount an experience on a boat off the coast of the Tortugas. He knows Quinn to be a courageous man even when confronting dangerous conditions. In concluding his petition to the Court for leniency Siwik indicated that Quinn is surviving during these difficult times, which he believes are far removed

from his core character. Optimistically Siwik suggested that "hopefully, one misguided error will not be allowed to impair his entire career." He went on to indicate that Quinn is not one to repeat mistakes. He said, "this, combined with his lifelong religious background guarantees that this type of incident will never happen again."

Victor Thompson, Special Agent with United States Customs, retired, had a twenty-five year relationship and was involved in over one hundred prosecutions in which Quinn was likewise involved. Thompson noted the qualities of honesty, integrity and courage, but also that Quinn was "unfailingly loyal to his fellow agents, the DEA, the court system and this nation." He concluded by stating that perhaps Quinn made the "mistake out of personal loyalty" and Thompson is sure it will not be repeated.

Bob Mazur was a Special Agent with IRS Criminal Investigations unit and likewise served Customs and the Drug Enforcement Administration. Mazur indicated that he has never dealt with anyone who at the core of their existence was more dedicated, competent, honorable, trustworthy and caring than Bob Quinn. He wrote that Bob demonstrated those qualities and that character "to anyone and everyone he came in contact with, from the janitorial staff in the building through the clerical staff, the management, prosecutors and even defense counsel." According to Mazur, that enabled Bob and his unique skills to develop some of the nation's most impactful confidential sources used to make the most important cases in the country. Mazur praised Quinn's natural talent, his ability to share informants, and recognized he was the beneficiary of Quinn's most professional style. He also noted that Quinn would take in individuals whose marriages were crumbling, ethics faltering and interactions with others failing. As opposed to shunning that type of person, as many people did, Quinn reached out and tried to counsel, be supportive and instill faith at the most critical of

moments.  Mazur wrote his detailed note knowing even the most intricate facts of the case and its consequences.

Mike Powers, a universally recognized DEA Special Agent in Charge, retired, described his personal admiration for the qualities Quinn exhibited as a man person and a friend. Powers added that in twenty-nine years he never knew Quinn to lie, even in the most trying of circumstances. Terri Keever knew Quinn at the University of South Florida. They continued a friendship that spanned years. She wrote how her nephew ran into trouble and her family was so concerned about the situation that they reached out to the only person they thought could help, Bob Quinn.  Quinn met the youngster along with his mother and made resolution of the problem a top priority. Although he had never met the young man before, Quinn left a lasting impression, stayed in touch afterwards and made a difference. Robert Miller wrote that after thirty-three years of law-enforcement service he's had an opportunity to reflect upon the friendship with Quinn and the influence Quinn had on him. He says that Quinn taught him how to identify, target, infiltrate and dismantle some of the largest and most complex drug trafficking organizations in the world. He noted that there is no doubt that the Tampa Bay Area region, as well as many parts of this country, are better places because of Bob's ability to put some of the most evil people in the world away.  Quinn succeeded due to his hard work, ethics, loyalty and his outstanding reputation.

Beth Dombeck is a lifelong friend. She retired from teaching school after twenty-eight years. She has an adult son with Down's Syndrome and has long been happily married to an Episcopalian priest. She noted that although they live far apart each time she visits Florida, Quinn drives several hours to visit her and see her son. She has suggested that "although there are consequences for one's actions in life [she] believes that one's behavior should not be viewed in isolation. Instead a person's

character and behavior should be looked at over a lifetime and not just on an incident that happened one day." Her note heaps genuine praise upon Quinn from a common perspective.

Fred Butler, Supervisory Special Agent, retired, from the Department of Homeland Security, Tampa Office, indicated that he has known Bob as a working agent since his arrival to Tampa nearly twenty-seven years ago. The relationship at the time between DEA and Customs was strained nationwide due to the turf battle over funding and statutory authority to investigate narcotic smuggling. DEA and Customs agents rarely spoke or cooperated with each other at the time, not only locally, but countrywide. Not so, he says about Quinn. He was a consummate professional who worked closely with Customs to great success. Willie Cancio, Supervisory Special Agent, retired, with the Department of Homeland Security, previously worked with United States Customs. His twenty-eight year career included many instances where he and Quinn shared informants, traveled together both to destinations domestic and abroad, and spent many days and nights working in successful prosecutions including of Colombian nationals. He described Quinn over that time period as steadfast in his ethics, morals and professional demeanor while maintaining an unblemished and stellar reputation among the law enforcement community. Cancio went on to write that Quinn is a man of family, faith and the highest moral character and principles.

Ronald L. Geer, a retired DEA agent with a fifteen year relationship with Quinn since his transfer from Atlanta to the Tampa District Office, noted in his submission that Quinn devoted twenty-five years to the country and selflessly supported investigations around the world always concerned more with the success of the prosecutions than with personal recognition or reward. He wrote, "Bob's reliability and truthfulness underscores his integrity, which demonstrates a reputation he enjoyed within the community he worked for, including state and federal law enforcement,

prosecutors, defense attorneys and the judiciary." Geer went on to describe Quinn as a person who enjoyed humility, which is one of his greatest attributes, allowing him to accept "life challenges with the same character that has made him a great agent, a dear friend and a caring father."

Stephen Collins, DEA Assistant Special Agent in Charge, retired, indicated he knew Bob for twenty-five years both as a fellow agent as well as a friend. He judged his abilities as a criminal investigator to be bar none one of the best witnessed in his entire career. He noted that successful agents oftentimes become cocky and egotistical and think of nothing but their own career advancement and differentiated that from the path Quinn chose. Instead Quinn was always there to lend advice and help his fellow workers across the nation in any manner he could, sometimes putting his own investigations aside for that purpose. Geer went on to describe that "perhaps one mistake for a friend and former coworker ultimately led to a terrible decision during a criminal investigation."

Sheila Geer, Special Agent in Charge of the Internal Revenue Service Criminal Investigation Division in Tampa, retired, noted that Quinn has touched many lives over his years of service and that many have benefitted from his strong conviction, truth and friendship. Nikki Hollman, DEA Special Agent, retired, supervised Quinn for five years. He was noted to be a dedicated and loyal servant to the citizens of the country, risking his safety and sacrificing always to fulfill the missions. Quinn has always been accountable and Hollman notes that he has taken responsibility for this mistake in his life thus prompting the suggestion that he's deserving of having his character and service considered in the sentencing decision. Thomas Garry supervised Quinn in his early days at the University of South Florida Police Department. Over seven years he noticed traits that impressed him. He noted that Quinn is one of those rare fellows in which you can place the trust of your own

life. Garry noted that he had done just that. He noted that Quinn was honest, forthright and an individual held in the highest regard by all people.

David Olson and Anna Sterling wrote about a scenario that developed out of the Cayman Islands when the couple found out about a contract on their lives. The man behind it was Leigh Bruce Rich, one of the most prominent drug dealers in the hemisphere and at one time Manuel Noriega's partner. Quinn became involved in that matter and helped not only at the time but later to give Olson and Sterling a chance at survival with such an awesome adversary seeking to destroy them. They wrote that Quinn is a person of outstanding character who would do anything to help them, still ten years later. According to the couple Quinn jeopardized his position to help others. They wrote "he had a dangerous job and did it well." As noted by Olson, they have no doubt that Quinn has made America a safer place. They believe his long and stellar career record supports all that they have said. Olson concluded by indicating that the help received from Quinn was priceless and above and beyond the call of duty.

Mark Fitzgerald wrote that as a retired Special Agent with DEA, having worked with Quinn at the Tampa office for nearly ten years, he is aware of the general facts of why Quinn appears before the Court. He was surprised by what occurred but at the same time sees the loyalty that Quinn always had for his friends. He notes perhaps this was Quinn's greatest fault, his loyalty to friends and coworkers. He went on to explain that "DEA agents form bonds with fellow agents as solid as brothers and a family. The nature of our work has made us dependent on one another for safety and survival and thus loyal and protective of one another." Fitzgerald notes that "Bob is shocked and embarrassed by his actions which are way out of character."

Diane Burgess, R.N.M.S.N, professor of nursing has indicated that this was, as far she has

heard, not to cause trouble for a fellow coworker and dear friend who worked side-by-side on very difficult cases. David Weatherly, Special Agent, retired, wrote from Tennessee that he knew Quinn for twenty-five years at DEA. He noted that as field project program manager for NDIC, Quinn was the DEA primary contact and always the go to person regardless of the short notice, odd time of day or inconvenience of the request, and who always demonstrated a willingness to assist and go above and beyond to ensure that information was truthful, accurate and timely. Quinn never asked when he could quit but what the next problem was to be worked on. This included extended undercover trips, countless hours of surveillance, trial preparation and even checking on the welfare of others in groups that needed assistance. His dedication was unwavering and he described Bob as a true person of moral character.

Emir Abreu is a retired Special Agent with the United States Custom Service. He worked numerous drug investigations with Quinn. He found Quinn to be honest, reliable and an integral part of all the investigations he was involved in. More importantly he noted Quinn did not engage in negative talk about anyone at any time and likewise he never heard anyone speak adversely about Quinn. Important to these proceedings is that he likewise noted that "Quinn always exhibited great loyalty to his agency, his peers and his friends." Abreu believes the charge Quinn is currently facing is due to his fierce loyalty for a colleague. Yet he acknowledged that Quinn has expressed to Abreu personally his sincere regret in the matter. Abreu wrote that Quinn "gives no excuses and fully accepts his responsibility. He realizes that there are consequences to the decision he made" in the case. Despite this tragic mistake, Abreu is confident of the future and still characterized Quinn as one of the most honest men he has ever met. He trusts him with his life and the life of his family without a second thought.

José Feliciano, from his deathbed, has taken the time to write to the Court. Feliciano is fighting hard during the final stages of Stage IV cancer, perhaps not alive by sentencing, yet he has continued to make inquiry about the status of Quinn. Feliciano described Quinn in his note as a great man and one of the most loyal and honest individuals he has ever known. He explained to the Court why he may not be in the courtroom on May 11 but that he wished for his voice to be heard.

Michael Geraghty described Quinn as the top candidate from over one hundred applicants nearly thirty years ago at DEA. As an example of the person Quinn is, Geraghty noted that he offered him a position and Quinn declined to take it because he had not given two weeks notice where he was working at the time. A call cured that problem but it was the embryo of the code of conduct Quinn always governed himself by.

A most unique letter comes from LR, whose identification cannot be developed in a public forum. LR has known Quinn for twenty-six years but the relationship began in a most unusual fashion. In 1989, after a long high speed car chase on the Courtney Campbell Causeway on a dark night, Quinn literally fished LR out of the bay where he had jumped to avoid capture. Eventually he was given the opportunity to "dig himself out of a big legal hole" and due to his aviation background DEA took a chance on him. LR flew undercover missions with Quinn that took him south of the border with all the hazard and high probability of not returning. LR heard others say that those flights were really suicide missions disguised as substantial assistance. Since those times he has stayed on the good side of the law. LR has maintained contact with Quinn, not suggesting in his note they became friends, as the agents' policy is to keep distance. But they have stayed in touch and this prompted the writing of the note and the risks associated with its exposure. While all his own hearings were *in camera* due to the nature of the operations he was engaged in, LR wanted the Court

to know how he believes Quinn is responsible for all the good that has come to him in the last quarter century. A most unusual submission when juxtaposed to the other inclusions.

A moving note comes from defense attorney Nelson Alfaro. He recounts how in a difficult debriefing, as things were beginning to unravel and tensions were rising, Quinn stood up amongst a roomful of agents and approached Alfaro's client. With his hand on the informant for support he started speaking to him in his native Wayuu language, words which to this day remain between the two of them. Thereafter things settled down and the informant provided significant information against AUC commanders of the paramilitary narco terrorist organization. Years later in exclusion proceedings perhaps, while others did not appear, it was Quinn who stood tall and truthfully described how the informant had helped the government and how he and his family would be killed if indeed they were returned to Colombia. It was evident to Alfaro before, then after what he did, that Quinn is a man of principle willing to take the difficult path and places the interests of others way before his own. Alfaro noted it would have been easy for Quinn to just go along with the rest of his colleagues and look the other way at the end but instead he stood out. He noted that compassion, loyalty and integrity have earned him the love and respect of many. Sadly, Alfaro noted, these are the same virtues that perhaps have caused him to appear before the Court for sentencing in this matter. Alfaro then closed with a quote from Judge Rakoff, in *United States v Adelson, infra*. Counsel would be remiss if he himself did not use the same quote that Nelson Alfaro penned in his letter in this memorandum, so it is used.

Perhaps the best note of all due to the unique association and the blend of characters comes from Valerie Diaz. In a deeply personal rendition Diaz revisits the tragedy of how her first husband was a DEA agent who was killed in the line of duty. She later married Cesar Diaz and for a lifetime

has maintained a close relationship with Cesar's good friend, Bob Quinn. They shared family and friendship, the good times and the bad. She noted how Quinn is the first person to help whenever someone needs to move, prepare their home for a hurricane, at the expected and untimely times of death, or to visit someone in a hospital. She went on to recount that as a professional she was able see that Quinn was always on top of his cases, his reports were impeccable and helpful, and his knowledge and memory of the cases were among the best. She characterized Quinn as being fair, compassionate and with an uncanny ability to see the best in defendants. When appropriate, Quinn would go the extra yard for them. Diaz, who knows Quinn so well, wonders how this fall from grace happened for a man of this character, caliber and intelligence. In her opinion, one that has been broadly accepted in many circles, "Quinn's involvement in the offense demonstrates his loyalty to a friend to a most certain fault. His decision to plead guilty to the offense demonstrates his determination to come clean, do the right thing and set an example not only for others but also for his daughter." She concluded with a critical assessment, that she believed "the larger portion of his life here on earth defines Bob Quinn. Bob Quinn deserves the same fairness and compassion he showed his defendants."

Jerry Clark, retired Tampa Police Department and DEA Task Force, has known Quinn since 1987. He finds Quinn to be the most honest, loyal, professional agent that he has had the pleasure of working with during his entire career He noted that Quinn has lost his job, his reputation and his right to vote and carry a firearm during this process. He characterizes "the depth of pain and destruction he has endured as seemingly unjust," yet he trusts "that justice prevails at the end."

Cesar Diaz is a retired DEA Special Agent. He has known Quinn since they were both students at the University of South Florida, members of the same fraternity. He noted that he

attended the police academy in 1979 along with Quinn, the latter being first in the class. He then worked with Quinn at the University of South Florida Police Department. Later Diaz went to DEA. In 1987 he recruited Quinn for DEA. He noted that Quinn graduated from the DEA Academy in Quantico first in his class. Quinn was later assigned to the Tampa district office. Diaz has always known Quinn to be involved in church and to enjoy the "utmost integrity and to be of high moral character." Diaz went on to note that in 1994 he was blessed with a daughter and looking for a godfather of outstanding character to be a permanent part of her life, he selected his friend Quinn. He noted also how much he did outside of work and that the behavior that Quinn displayed in this offense is not who he really is. Diaz went on to write that he is keenly aware that failing to divulge facts to FBI agents is a serious offense, however, he also noted that the conduct displayed by Quinn in this case was and is an "aberration in an otherwise exemplary life and it was not the behavior of the man, the friend, the colleague" whom Diaz has known for thirty-eight years.

## VI. THE GUIDELINES PROPOSED IN THE PRESENTENCE INVESTIGATION REPORT AND THE OBJECTIONS RAISED

Probation has determined that an enhancement for abuse of position of trust (U.S.S.G. §3B1.3) is appropriate, despite the objections of both the defense as well as the government. Interestingly on April 11, 2016, the government prefaced its factual and legal memorandum objecting to the enhancement by noting the following:

> "We are in receipt of the Preliminary Presentence Investigation Report ("PSR") for defendant Robert Joseph Quinn ("Quinn") and attorney Ralph Fernandez's objections to that report. **Based on the evidence in the case and my accessment of the applicable provisions of the United States Sentencing Guidelines, we agree with Mr. Fernandez's objections to the imposition of the enhancements for abuse of position of trust** (U.S.S.G. §3B1.3)..."

Each section warrants further discussion and some supporting authority is provided.

*ABUSE OF A POSITION OF TRUST*

The enhancement for abusing a position of trust is set forth at §3B1.3, United States Sentencing Guidelines. The sentencing guidelines explain that:

> "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."

Application Note 1 defines public or private trust as follows:

> "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."

A three (3) prong test has been established by the Eleventh Circuit to aid courts in determining whether a §3B1.3 enhancement is appropriate. This test was developed in *United States v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001). The *Liss* court, citing *United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998), provided that in order for such an enhancement to apply, the defendant must have been:

1. In a position of trust with respect to the victim of the crime;
2. That position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense; and,
3. The defendant abused the discretionary authority entrusted to him or her by the victim. *Id*.

Each of the elements set forth above warrant further exploration, however, what is critical to establish at the outset of the analysis is the burden required and the responsibility for it. In *United States v. Maddox*, 803 F.3d 1215 (11th Cir. 2015), the Eleventh Circuit explained that the question as to whether an enhancement is appropriate is determined by whether the government proves by a preponderance of the evidence the defendant engaged in conduct which would warrant the enhancement sought. *Id*. at 1221. As such in this case the government must prove the three prong test by a preponderance of the evidence and the government has already indicated it can not and it will not. Frankly that should be the end of the inquiry so it is puzzling that a third party suggests otherwise.

## *A POSITION OF TRUST*

The issue of being in a position of public or private trust was discussed in *United States v. White*, 270 F.3d 356, 372 (6th Cir. 2001). The *White* court explained that "position of public or private trust" is a term of art which addresses some of the aspects of the legal concept of trustee or fiduciary, but not an approximation of the ordinary dictionary concept of reliance or confidence. In *United States v. Hernandez*, 488 Fed.Appx. 394, 396 (11th Cir. 2012) (citing *United States v. Ward*, 222 F.3d 909, 911-13 (11th Cir. 2000) it was established that the key in determining whether a defendant held a position of public or private trust is whether that defendant had sufficient professional discretion, meaning substantial discretionary judgment, which usually carries "considerable deference."

In *United States v. Dinnall*, 313 Fed.Appx. 241, 245 (11th Cir. 2009) (citing *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008), the term "position of trust" was defined as

involving "more than a contractual or arm's length commercial relationship." In *Garrison*, *supra*, at page 837, it was further established that whether a defendant holds a position of trust must be determined from the vantage point of the victim of the crime at issue.

In the case before the Court, the victim of the Defendant's crime would be the Department of Justice and thus the question of whether Quinn held a position of trust must be taken from the perspective of the Department of Justice. The defense would agree that when the Defendant was an active special agent with the DEA, he held a position of trust. However, at the time the offense charged was committed, Quinn was no longer a special agent. The Defendant was convicted of one count of making materially false statements to the FBI on April 17, 2014, three and a half months after he retired from DEA. Thus at the time of commission the Defendant was no longer employed by the Department of Justice in any fashion and did not hold a position of public or private trust with the Department of Justice.

The enhancement at issue is limited to the offense committed and not to relevant conduct. The United States Sentencing Guidelines defines "relevant conduct" at §1B1.3(a) which states that:

> "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant...**that occurred during the commission of the offense of conviction**, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." (emphasis added).

In *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006), the Eleventh Circuit held that relevant conduct includes actions which were "part of the same course of conduct as the offense of conviction." In *United States v. Jones*, 367 Fed.Appx. 109, 111 (11th Cir. 2010) (citing U.S.S.G. § 1B1.3, cmt. n.9(8), the Eleventh Circuit once again provided that:

"offenses qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id*.

Further in *United States v. Myles*, 314 Fed.Appx. 164, 168 (11th Cir. 2006) (citing *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994), the Eleventh Circuit explained that:

"In determining whether uncharged conduct is relevant, [the court must] evaluate the similarity, regularity, and temporal proximity between the counts of conviction and the uncharged conduct." *Id*.

As explained above, relevant conduct can not be considered when determining the appropriateness of a §3B1.3 enhancement. However, even if relevant conduct could be considered, at no time during the commission of the charged crime, or at any time thereafter, was Quinn a DEA agent and thus there is no temporal connection between the offense and the Defendant's previous employment with the Department of Justice. Logically it follows that he was simply not in a position of public or private trust at the time.

### THE POSITION OF TRUST MUST HAVE CONTRIBUTED IN SOME SIGNIFICANT WAY TO FACILITATING THE COMMISSION OF THE OFFENSE

The second prong of the test is whether Quinn used a position of trust in a significant fashion facilitating the commission of the offense. In making a determination as to whether the Defendant did use a position of trust to significantly facilitate the commission of the offense, the Court should determine whether Quinn used any special knowledge afforded to him as a result of his position of trust (if he had held the position at all) in order to facilitate the crime charged. *United States v. Szekely*, 632 Fed.Appx. 546, 549 (11th Cir. 2015) (citing *United States v. Brenson*, 104 F.3d 1267, 1287 (11th Cir. 1997). In *United States v. Smith*, 231 F.3d 800, 819 (11th Cir. 2000), the Eleventh

Circuit explained that significant facilitation exists when the individual that holds the position of trust has an advantage in the commission of the charged criminal activity. *Id*. The Eleventh Circuit in *Hernandez*, *supra*, at 397, further explained that the enhancement should apply when the defendant uses "any special knowledge or access provided by his position of public trust to facilitate or conceal the offense."

Even if the Defendant had held a position of trust, which he had not, he did not use any special knowledge or access in the commission of the offense. In no way did the fact that Quinn was a former DEA agent significantly contribute to the false statements made. The Defendant was simply covering for a long time friend and colleague. Further the fact that Quinn was a former agent did not allow him to more easily make a false statement.

The distinction is soundly contrasted by the factual scenario presented in *United States v. Terry*, 60 F.3d 1541 (11th Cir. 1995). In *Terry*, the defendant was a deputy sheriff who was engaging in narcotic dealings. *Id*. at 1543. During several undercover stings Terry and one of his co-conspirators sold narcotics to an undercover law enforcement officer. *Id*. When Terry was sentenced the district court applied the abuse of a position of trust enhancement. *Id*. at 1543, 1545. The Eleventh Circuit, in upholding the enhancement, pointed out that Terry committed the offenses while in uniform and while using his marked patrol unit which was equipped with a radio that provided others involved in the transaction with a sense of security and because the police cruiser had a radio, it allowed Terry to act as a lookout against other police interference. *Id*. Thus the Terry court held that by using his police cruiser and by monitoring the radio, Terry was able to monitor police traffic and ensure that no other officers interrupted the criminal activity. This facilitated both the commission as well as the concealment of the offense charged. Clearly Quinn did not use his

former position as a special agent to facilitate the commission of the offense charged nor did he use his former position to conceal the crime.

## THE ABUSE OF THE DISCRETIONARY
## AUTHORITY ENTRUSTED TO HIM

In order to meet this third "element" the government would have to prove, by a preponderance of the evidence, that the Defendant took advantage of the discretionary authority entrusted to him by the victim, the Department of Justice. Arguably while Quinn was an active agent at DEA, he was entrusted with discretionary trust. At the core of this trust was an understanding that he would be truthful. Once again though, he was not an active agent at the time of commission of the offense and at that time he was not entrusted with any discretionary trust by the Department of Justice. He was simply an ordinary civilian. Therefore he could not have taken advantage of any special trust as he was not afforded any at the time.

## VII. APPLICABLE SENTENCING AUTHORITY

The Court is well aware of the dramatic change in the sentencing landscape expected after *United States v. Booker*, 543 U.S. 220, 259-60, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) . Whether such change ever came about is the subject of opinion and makes for interesting discussion. One court's assessment of *Booker* always seems worthy of inclusion in any sentencing memorandum, particularly since it mentions the roles of probation officers in the sentencing process:

> We must consider the profound impact of the Supreme Court's decision in *Booker* on federal sentencing . . . . To understand the transforming nature of *Booker*, it helps to consider the nature of sentencing proceedings before the implementation of the mandatory federal Guidelines in 1987, which drastically altered the practice of sentencing in the federal criminal justice system. Before the Guidelines were implemented, Congress had delegated virtually unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range of potential

sentences prescribed by statute. The role of probation officers was to facilitate, rather than to circumscribe, judicial discretion. To this end, the primary purpose of the presentence report was to aid the court in determining the appropriate sentence, and included an assessment of the problems of the defendant and a consideration for the safety of the community. The presentence report suggested a particular term of imprisonment, based on national sentencing statistics and the officer's informed judgment, but the role of the probation officer in sentencing was purely advisory. The sentencing judge could make use of the information in the presentence report or disregard it; the judge had complete discretion to balance the various goals of sentencing, the relevant aggravating and mitigating circumstances, and the way in which these factors would be combined in determining a specific sentence. The sentencing judge was free to impose a sentence anywhere within the statutory range, and could usually replace imprisonment with probation, if he so chose. Finally, judicial discretion was "unfettered" primarily because appellate review of the district judge's discretion was virtually non-existent.

*Booker* was a signal event in the development of the law. It restored the complete discretion of sentencing judges to sentence anywhere within the statutory range, so long as the sentence is tethered to the congressional goals of sentencing set forth in 18 U.S.C. § 3553(a). *United States v. Ameline*, 409 F.3d 1073, 1097-98 (9th Cir. 2005) (internal quotation marks and citations omitted).

Title 18, United States Code, Section 3553 language is generally included in any sentencing submission. For easy reference this memorandum does not differ from the norm. The law is clear:

Factors to be considered in imposing sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed educational

or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5) any pertinent policy statement–
    (A) issued by the Sentencing Commission . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense. 18 U.S.C. §3553(a).

The guidelines calculations as well as the ancillary objections will be resolved before the traditional sentencing factors are considered, be it in support of a variance or otherwise. Yet the guideline calculation is only the beginning of the story. Pursuant to *United States v. Booker*, *supra*, after calculating the applicable sentencing guideline range, the district court is required to look beyond the guidelines and to consider the case under 18 U.S.C. §3553(a), as part of the tethering process. Congress has instructed that:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.
    Paragraph (2) of subsection (a) requires the court to consider: the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....18 U.S.C. § 3553(a).

The district court is required to consider the guidelines, but it is prohibited from presuming that a guideline sentence would be a reasonable sentence. *Rita v. United States*, 551 U.S. 338, 351,

127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).

Some factors to consider in this matter include the age of the defendant, fifty-nine years old; no prior criminal record; and, zero risk of repeat offenses. Quinn has lost the opportunity to continue in law enforcement, for that matter, he lost his job as a State of Florida investigator. The crime did not involve violence and there was no element of corruption. Quinn covered for a colleague and friend, but he was not the instigator of the crime and did not benefit from it in any way. Quinn quickly came clean. He provided all information later requested. He assisted the prosecution and the investigation.

The Court has been provided a volume of information showing the defendant's character over a lifetime and the isolated event that prompted this, albeit the product of a lapse in judgment. The information also shows Quinn's generosity with time and talent, his assistance of those in need, especially where he had neither familial nor moral obligation to help and where he received no publicity or recognition for his acts of kindness. The evidence confirms a strong religious bond and derivative service that came from it. This is not the entire picture, of course, but these are all factors that could reasonably lead this Court to exercise its discretion under Section 3553(a) and impose a sentence without confinement, or for that matter, no sentence at all. See *Gall v. United States*, 552 U.S. 38, 48-49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (affirming below-guideline sentence of probation and recognizing substantial restrictions on liberty imposed by sentence of probation).

The issues of retribution and deterrence have largely been addressed. Whether the victim is the Department of Justice or the American people as a whole, a message has been sent loud and clear that in a false statements case there can be a dramatic end even to the most honorable of careers, that the consequences have ravaged Quinn, and sadly, that no further example need be set. As to similarly

situated defendants there are not many cases that offer guidance. The reason is that rarely are these prosecutions brought forth because of the discretionary nature of the filing decisions and the ripple effects the cases may necessarily have.

## VIII. THE RESOLUTION OF GUIDELINE ISSUES
## AND THE IMPACT ON PROCEDURE

Given the revised PSR the invitation to respond to further disputed facts and conclusions is almost too much to pass on. But the more reasonable proposition is simply to trump the exercise with some authority that supports avoidance of the conflict altogether.

Under *Booker* and *Gall*, the district court is required to calculate the applicable sentencing guidelines for the crime and the criminal, and an error in the calculation is a procedural error in sentencing that may require a remand. *Booker*, *supra*; *Gall*, 552 U.S. at 49-51, 128 S.Ct. 586 (2007). At the same time, however, it is clear that errors in calculating the advisory guideline calculations are subject to harmless error analysis. See *United States v. Abbas*, 560 F.3d 660, 666-67 (7th Cir.2009) (holding guideline error was harmless); *United States v. Anderson*, 517 F.3d 953, 965-66 (7th Cir. 2008) (same); see generally, *Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) (stating before *Booker* that guideline errors were subject to harmless error analysis).

In both *Abbas* and *Anderson*, the district courts recognized the disputed guideline issues, stated that their sentences would be the same regardless of how the guideline issues were decided, and provided thoughtful explanations for their reasoning. In such cases, because the sentencing guidelines are no longer mandatory, appellate courts should readily find that guideline errors are harmless.

Correct application of the guidelines can present many difficult or esoteric questions, including many that have little to do with the ultimate legal and moral judgment about an appropriate sentence. Since *Booker*, many courts have often recognized that a sentencing judge may impose a reasonable sentence under section 3553(a) regardless of how a difficult guideline issue might be resolved. "When a judge proceeds in this manner, [the Judge] must make clear that the § 3553(a) factors drive the sentence without regard as to how the prior conviction fits under a particular guideline. Doing so will make the often nit-picking review of issues like this under our now advisory guideline scheme unnecessary." *United States v. Sanner*, 565 F.3d 400, 406 (7th Cir. 2009) (affirming above-guideline sentence without regard for correct resolution of guideline issue); *Abbas*, 560 F.3d at 666-67 (finding that district court erred in guideline calculation but holding error was harmless based on judge's explanation of alternative basis for same sentence).

As *Abbas* and *Anderson* make clear, this is not to say that a district court can insulate any sentence from appellate review by saying a few magic words about section 3553(a). *Abbas*, 560 F.3d at 666-67; *Anderson*, 517 F.3d at 965; accord, *United States v. Peña-Hermosillo*, 522 F.3d 1108, 1118 (10th Cir. 2008) (finding guideline error was not harmless where district court provided only "perfunctory" explanation for alternative rationale); see generally *United States v. Williams*, 431 F.3d 767, 773-76 (11th Cir. 2005) (Carnes, J., concurring) (encouraging district courts to provide alternative sentencing rationales where resolution of disputed guideline issues would not affect sentences). But where the record shows that the district court considered the disputed guideline issue, considered the prospect that its decision on the issue might be wrong, and provided a thoughtful explanation of its reasons under section 3553(a), it should be relatively easy to find that an error in calculating an advisory guideline is harmless.

## IX.  POTENTIAL VARIANCE

The defense recognizes that an argument raised is more along the lines of a variance rather than a specific objection.  The dissenting opinion in *Irizarry v. United States*, 553 U.S. 708, 128 S.Ct. 2198 (2008), provides as follows:

> "The Court creates a legal distinction without much of a difference. The Rule speaks specifically of 'departure[s],' but I see no reason why that term should not be read to encompass what the Court calls §3553(a) 'variances.' The Guidelines define 'departure' to mean 'imposition of a sentence outside the applicable guideline range or of a sentence that is otherwise different from the guideline sentence.' United States Sentencing Commission, Guidelines Manual (USSG), § 1B1.1, comment., n. 1(E) (Nov.2007). So-called variances fall comfortably within this definition. Variances are also consistent with the ordinary meaning of the term 'departure.' See, e.g., Webster's Third New International Dictionary 604 (1993) (defining 'departure' to mean a 'deviation or divergence esp. from a rule' (def. 5a)). And conceptually speaking, the substantive difference between a 'variance' and a 'departure' is nonexistent, as this Court's opinions themselves make clear. See, e.g., *Gall v. United States*, 552 U.S. 38, 46–47, 128 S.Ct. 586, 594–95 (2007) (using the term "departure" to describe any non-Guideline sentence); *Rita v. United States*, 551 U.S. 338, 350, 127 S.Ct. 2456, 2464 (2007) (stating that courts "may depart either pursuant to the Guidelines or, since *Booker*, by imposing a non-Guidelines sentence")."  *Id.* at 2204-2205.

It is possible that the record here supports a variance on what could be termed novel grounds. The letters, as well as the balance of the submission, establish that DEA agents, including Murad and Quinn, were closer at times than family. Usually assigned to the same groups for years the bonds persisted and each intended to protect the other from any  actual or perceived danger. This created a bond not unlike the closest of bloodlines or members of tight knit families. That loyalty indeed may have prompted Quinn to sense danger for his friend Murad and make the choice he made.

# X. ARGUMENT

A case of marked contrast in terms of the nature and circumstances of the offense, implicating an intended loss of more than fifty million dollars still offers guidance to the matter *sub judice*. In *United States v. Adelson*, 441 F.Supp.2d 506 (2006), the Court noted as for "the history and characteristics of the defendant," that it was undisputed at the time of sentencing that Adelson's past history was exemplary. Over a hundred persons from all walks of life submitted detailed letters attesting, from personal knowledge, to Adelson's good works and deep humanity. Several letter writers described Adelson's "generosity of spirit," his ever-present willingness to go above and beyond the call of duty to help others. As one friend recounted, Adelson would "speak to [another friend who was suffering from mental illness] on the phone at all hours and drive 3 to 4 hours at a moment's notice to care for him." *Id*. Others described Adelson as "in the short category of people who we know we can rely on to be there for us no matter what we might need." These letters from friends and family also detailed numerous acts of compassion and generosity that dated back to the defendant's childhood. Not only friends, but also prominent business colleagues, educators, lawyers, doctors, accountants, health care specialists, clergymen, policemen, and other people whose lives were touched by Adelson's acts of kindness, wrote to the Court to express their admiration for the defendant's integrity and generosity. Numerous colleagues at Impath who personally suffered from the fraud perpetrated nevertheless also wrote the Court on Adelson's behalf, describing the defendant's commitment to Impath and to its mission to improve the lives of cancer patients.

As these examples attested, Adelson's good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. **But, surely, if ever a man is to receive credit for the good he has done, and his**

immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. **This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."** *Id*. at 514. (emphasis added)

While the Adelson reasoning instructs inasmuch as there are similarities with Quinn as to character and service, Quinn appears before the Court not on a fifty million dollar loss prosecution but because he feared for the future of his friend and without anything to gain himself made an error in judgment to protect his friend.

## XI. ABERRANT BEHAVIOR

Section 3553 includes a provision for consideration, the pertinent policy statements that require the Court's heightened attention. This is a most important factor in these proceedings as this is an textbook example of aberrant behavior.

The Court should depart downward from the guideline sentence based upon the fact that the conduct of Quinn was an isolated incident and aberrant behavior. If there was ever a case that fit an imaginary Webster's definition of aberrant behavior, this would be it. Aberrant behavior is set forth in §5K2.20, United States Sentencing Guidelines, which provides as follows:

> "(a)    IN GENERAL.--Except where a defendant is convicted of an offense involving a minor victim under section 1201, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code, a downward departure may be warranted in an exceptional case if:
>
>         (1)    the defendant's criminal conduct meets the

requirements of subsection (b); and

(2)     the departure is not prohibited under subsection (c).

(b)     REQUIREMENTS.--The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that:

(1)     was committed without significant planning;

(2)     was of limited duration; and

(3)     represents a marked deviation by the defendant from an otherwise law-abiding life.

(c)     PROHIBITIONS BASED ON THE PRESENCE OF CERTAIN CIRCUMSTANCES.--The court may not depart downward pursuant to this policy statement if any of the following circumstances are present:

(1)     The offense involved serious bodily injury or death.

(2)     The defendant discharged a firearm or otherwise used a firearm or a dangerous weapon.

(3)     The instant offense of conviction is a serious drug trafficking offense.

(4)     The defendant has either of the following:

(A)     more than one criminal history point, as determined under Chapter Four (Criminal History and Criminal Livelihood) before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category); or

(B)     a prior federal or state felony conviction, or any other significant prior criminal behavior, regardless of whether the conviction or significant prior criminal behavior is countable under Chapter Four."

The commentary for §5K2.20, United States Sentencing Guidelines, also explains that there are additional circumstances which the Court may consider in determining whether the Defendant's conduct was aberrant. Those factors are as follows:

"(A) mental and emotional conditions;
(B) employment record;
(C) record of prior good works;
(D) motivation for committing the offense; and
(E) efforts to mitigate the effects of the offense."

These factors are critical in the analysis *sub judice*, as they support the Quinn request for a downward departure or variance. What Quinn did is a marked deviation from a lifetime of integrity and honesty. Colleague after colleague, friend after friend, even clergy, repeated in the letters Quinn never lied, never twisted stories, never deceived anyone, in any case or any relationship, for a lifetime. All that wrote about this event confirmed it was out of character, a complete departure from his persona. And he did it, with nothing to gain, out of misguided loyalty, for a colleague and friend.

In *U.S. v. Darji*, 609 Fed.Appx. 320 (6th Cir. 2015), the district court reiterated the language set forth above when it explained that "a downward departure under § 5K2.20 is appropriate 'only if the defendant committed a single criminal occurrence or a single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." Given the record presented to this Court it is clear that the false statements made by Quinn were in stark contrast to anything else of substance ever uttered in the balance of his life.

## XII. CONCLUSION

This Court is presented with an acutely vexatious sentencing decision. Before the Court stands a man who has towered above most both in physical stature as well as well earned respect. Quinn is a man who has been an example in every facet of life, a man who had a close relationship with a unique character, perhaps something that many could never understand, but from which he is not shying away even in these most difficult of times. For reasons perhaps even Quinn cannot fully

fathom he did what he did because he felt that was the only way to protect his friend, a fellow he had been involved in firefights next to, in dangerous investigations with, and in moments of personal tragedy alongside. In a time of need Quinn felt that if he did not cover for Sam Murad, Murad's life would be shattered. The mistake was quickly remedied, the end of the story abrupt.

When Quinn first walked into counsel's office he looked around and noticed a large mirror on one wall. Counsel saw that Quinn stopped, looked at himself for an instant and bowed his head. A conversation followed at the conclusion of which counsel indicated that this appeared to be a defensible case. A pained Quinn looked up and said, "this is not about defending this, this is not about public perception or my future alone, this is about doing what is right." Quinn recounted how every morning when he awakened and looked at his reflection in his own mirror he saw a silhouette he did not recognize. What he had done had affected his health, had made him age and made him very sad. He felt that he had disappointed his daughter, his wife, his community and all those he had worked with and for. He said this charade could not continue another day. "It's all about me," Quinn said, "I have prayed a great deal over this.  I did wrong and I want to put this behind me."

It's never easy for any lawyer to give advice, particularly in a case in which other professionals will opine as to what should have been done and what could have been done better. Yet the decision made was ratified quickly and expeditiously. By week's end the matter had been resolved and a plea agreement executed. A new Bob Quinn surfaced more along the lines of the one that everybody had grown over the years to know, love and respect. A significant weight had been lifted from his shoulders. The time had come to move on.

When this Court fashions an appropriate sentence in this case and that sentence is imposed, a message will be sent that no one is above the law. Yet in that delicate analysis the Court may

conduct it is respectfully submitted that the sentence imposed should give Quinn credit for the good he has done and his misconduct assessed in the context of the life he has lived and the impact of his actions on those whose lives he has touched. The testimony of those who will speak before the Court and the record before the Court will certainly establish Quinn's generosity of spirit, his purity of mind, his ever present willingness to go above and beyond the call of duty to safeguard his friends, his colleagues, his country, and above all, his faith in the divine and in our system of justice.

In the case of ROBERT JOSEPH QUINN, given all the facts and argument brought before the Court for consideration, it is respectfully submitted that a significant expression of leniency will neither depreciate the seriousness of the offense nor promote disrespect for the law. Humbly and respectfully ROBERT JOSEPH QUINN requests this Court to exercise favorable discretion upon his request.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic delivery to the Office of the United States Attorney, this 6th day of May, 2016.

Respectfully Submitted

_____
RALPH E. FERNANDEZ, ESQUIRE
LAW OFFICE OF RALPH E. FERNANDEZ
109 South Moody Avenue
Tampa, Florida 33609
Telephone: (813) 251-5991
Florida Bar No: 246425
Attorney for Defendant

W:\15\15-224\sentencing memorandum II.wpd